**FILED**

APR 0 5 2010

CLERK
United States Bankruptcy Court
San Jose, California

Case No.: 10-50221

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

MARILYN POPE,

           Plaintiff,

v.

JOHN JEFFERSON VITALICH
AND MARIA TERESA
AURIGUE VITALICH,

           Defendant.

_____/

COMPLAINT FOR DECLARATION OF
NON-DISCHARGEABILITY AND
DAMAGES

Adversary Proceeding No.:

PLAINTIFF COMPLAINING OF DEFENDANT ALLEGES:

I.

Non-Dischargeability of Judgment for Fraud [FRBP §523(a)(2)]; , Embezzlement [FRBP §523(a)(5)] and wilful and malicious injury [FRBP §523(a)(6)]: On October 27, 2009, a Judgment was entered in The Superior Court of the State of California for the County of Monterey, Action No. M 90481, in behalf of Plaintiff and against Defendants, John Vitalich and Maria Teresa Vitalich as follows:

"$500,000.00 in economic damages plus interest at 10% per year from April 18, 2008, plus attorney fees in the amount of $40,672.00, as against Defendants John Vitalich and Maria Teresa Vitalich. As of October 18, 2009, principal and interest will total $575,000.00, plus $137.98 per day until paid.

$200,000.00 additional in exemplary damages as against Defendant, John Vitalich. Plaintiff proved by clear and convincing evidence that John Vitalich was in a *fiduciary relationship* with Plaintiff, but *acted oppressively, fraudulently and in breach of his fiduciary relationship* with

1

*Plaintiff and her property ownership rights*."

A file-stamped copy of said Judgment is attached hereto, marked Exhibit "A", hereby referred to, and made a part hereof by this reference thereto.

II.

Judgment determining amount of debt and non-dischargeable nature of acts is *res judicata:* All of the acts which directly resulted in the Judgment being issued constituted fraud, embezzlement, and injuries inflicted on Plaintiff with wilful and malicious intentions, and were committed by John Vitalich for the benefit of the community interests of Defendants with the intention to cause such injuries. The determination of such intentions in said Judgment are *res judicata*, and arose from the facts hereinafter alleged in this Complaint. As recited in said Judgment, all of the aforesaid determinations of the misconduct which formed the basis of the Judgment were based upon "clear and convincing evidence that John Vitalich was in a fiduciary relationship with Plaintiff, but acted fraudulently, constituted embezzlement and were perpetrated with the express and implied intention to inflict wilful and malicious injury upon Plaintiff and her property ownership rights."

III.

Plaintiff and Plaintiff's Property: At all of the times herein mentioned, Plaintiff was and is an artist lacking experience and sophistication in investments, and possessed of very few assets, limited income, and a correspondingly low risk thresh hold. At all times herein mentioned, Plaintiff owned:

A. a residential property commonly known as 161 Dolphin Circle, Marina, California, ("Dolphin"), upon which she was obliged to make $4,500.00 monthly payments, but in which she had an equity of approximately $300,000.00. In addition, prior to the events herein described, Plaintiff also formerly owned:

B. a residential property commonly known as 121540 Pasquale Road, Nevada

2

City, California, 95959, ("Nevada City") with an equity of approximately $200,000.00 therein.

Said properties and all other property formerly owned by Plaintiff, has now been foreclosed upon and/or lost as the direct result of the wrongful conduct hereinafter described.

IV.

Defendant, John Vitalich; Real Estate Developer and Owner of Marina Drive: At all of the times herein mentioned, Defendant, John Vitalich, was and is an experienced and sophisticated real estate investor, developer and a joint venturer with the other named defendants herein in all of the matters and transactions herein described. As of the time that Vitalich met Plaintiff, he was the owner of residential property commonly known as 3275 Marina Drive, Marina, California, ("Marina Drive") and was fully aware of the lack of experience, sophistication, assets and income of Plaintiff, and proceeded to exploit the same as hereinafter particularly described.

V.

Relationship and Conspiracy Among Vitalich, Cypress, Omeara, Lauren and Running Horse Inducement of Plaintiff: Vitalich aggressively attempted to promote and sell Marina Drive to Plaintiff by orally representing to her that he had made "a killing" and "millions in real estate" and that she could also do so with his direction and guidance. Recognizing that Plaintiff had acquired an equity of approximately $300,000.00 in Dolphin, and an equity of approximately $200,000.00 in Nevada City, as well as the exquisitely naive and gullible nature of Plaintiff, Vitalich "referred" Plaintiff to Defendants, Lauren and Cypress for the *ostensible* purpose of acting as Plaintiff's real estate agent, broker and adviser in promoting and documenting the sale of Marina Drive to Plaintiff, but for the primary and true purpose of targeting Plaintiff. Since the primary business of Cypress, Lauren and O'Meara was in brokering loans and in finding

3

financing for Running Horse, rather than in negotiating and selling real property, the primary reason for the "referral" was to induce the misappropriation and liquidation of Plaintiff's equity in Dolphin by promoting and selling to Plaintiff a security (investment) in Running Horse by inducing Plaintiff to "loan" $200,000.00 to Running Horse with purported assurances and "security" hereinafter described which were and are false and worthless. At all of the times herein mentioned, Defendant, Running Horse Golf and Country Club, LLC, was and is a purported Limited Liability Corporation, of which Defendant, Tom O'Meara, was also the "managing member", and who personally participated in, approved and ratified the fraudulent sale of securities to Plaintiff hereinafter described. For all of the reasons hereinafter described, Plaintiff reposed trust and confidence in Defendants and the individual and corporate broker in all of the matters and transactions herein described. At all of the times herein mentioned, all named Defendants acted in concert and pursuant to a wrongful agreement to defraud Plaintiff by taking advantage of their fiduciary positions, their superior knowledge of the facts and the exquisite naivete' of Plaintiff, all as hereinafter more particularly described.

**FIRST CAUSE OF ACTION**

**INTENTIONAL CONCEALMENT OF MATERIAL FACTS**

VIII.

Incorporation by Reference: The allegations contained in Paragraphs I through VII of the Preliminary Allegations are hereby referred to, and made a part hereof by this reference thereto.

IX.

True Material Facts Concealed from Plaintiff by Defendants: At the time and place of the above described referral, the following actual facts and conditions existed which materially impacted the negotiations and transactions among the parties, all of which facts and conditions Defendants were acutely aware. Said facts and conditions

4

were concealed from Plaintiff by all Defendants at all relevant times of the transactions and agreements herein described:

A. Plaintiff is informed and believed that Vitalich had a long-standing business relationship with all of his co-defendants and was aware of their need for investment capital in Running Horse;

B. Running Horse was already in deep financial trouble in financing the development and sale of Running Horse golf course and adjacent real estate lots;

C. Running Horse was also the defendant in many lawsuits and plagued by debt and attorney fees;

D. The prospects for Running Horse's ultimate success were very remote;

E. There were no offering circulars or other disclosure documents disclosing the multitude of risks and dangerous downside of any investment in Running Horse, all as required by California and U.S. law and regulations governing the promotion and sale of securities;

F. The loan requested by Defendants was a grossly unsuitable investment for Plaintiff, considering her absence of expertise, the marginal amount of her hard-earned and carefully saved assets and the modest amount of income of Plaintiff, which was irregular and incapable of predictability, and totally inadequate to assume the liabilities foisted upon her by Defendants in the transactions herein described;

G. Defendants possessed far superior sophistication, facts and information about the loan, "investment" and subject of real property, in general, and the above described transactions and properties, specifically, promoted to the exquisitely naive Plaintiff and always intended to take advantage of that disparity by defrauding Plaintiff;

H. By the time of the Vitalich "referral" of Plaintiff to his co-defendants, Defendants wrongfully agreed together to execute a combination of the affirmative misrepresentations, concealment of material facts and securities violations herein

5

described in order to induce Plaintiff to purchase a property and to make an investment which she could not afford and assume risks which were entirely unsuitable for her.

## X.

Facts Concealed Were Material: Each and all of the above facts were material in that Plaintiff would not have entered any business transactions whatsoever with Defendants if she had been aware of the true facts.

## XI.

Duty to Disclose; Fiduciary Duties and Conflicts of Interest by Defendants: Notwithstanding all of the above facts, the above named agent, brokers and officers of Cypress assumed fiduciary duties to Plaintiff and positions of direct, serious conflicts of interest in all of their dealings with her, by:

A.   acting as both the agent and broker for Plaintiff regarding her purchase of Marina Drive, and, at the same time, also representing Vitalich, as Seller as dual agents and brokers. In order to create this inherent conflict of interest, Vitalich deceptively and artfully manipulated Plaintiff to use his own agent and broker in the transactions herein described who were already duty bound to obtain the highest price for Marina Drive on the best possible terms for the Seller, thereby depriving Plaintiff of professional objective advice in the Marina Drive sale; accurate and professional evaluation of the realistic resultant financial burdens, the protection of Plaintiff's existing equities, and in the resultant and related promotion and sale of securities in the investment in Running Horse;

B.   receiving the contemporaneous "referral" of Plaintiff from Vitalich for the purpose of targeting her to make loans and/or investments for the benefit of said agents and brokers and their related investment ventures. In all of such transactions said real estate brokers and agents purportedly acting in behalf of Plaintiff to professionally guide and advise her, and to protect her assets, were beholden and indebted to Vitalich for

6

referring and guiding Plaintiff into their fraudulent promotion and sale of securities to Plaintiff as herein described, and continued to act adversely to Plaintiff in that conflict of interest position throughout the transactions herein described;

C.  acting in a fiduciary capacity as real estate brokers and agents of Plaintiff contemporaneously with the time they were fraudulently promoting and selling investments and securities to Plaintiff.

XII.

Intentional Concealment; Special Information; Superior Knowledge:  Defendants intentionally or negligently concealed or suppressed all of the above described material facts except that "Defendants possessed far superior sophistication, facts and information about the loan, 'investment' and subject of real property, in general, and the above described transactions and properties..."  However, that fact is independently material because such superior knowledge and/or special information renders Defendants responsible for expressions of opinion as well as representations of fact.

XIII.

Plaintiff Unaware of Concealed Facts: At all of the times herein mentioned Plaintiff was unaware of all of the material facts hereinabove described (with the exception of Defendants' superior knowledge or special information) and would not have purchased the Marina Drive property from Vitalich, nor would she have made any investments or loans with or to the other Defendants if she had known of the concealed and suppressed facts.

XIV.

Plaintiff Sustained Damage Caused by the Concealment of the Above Described Material Facts: Damages have been sustained by Plaintiff as alleged in Paragraph I hereof. The allegations of which are hereby incorporated by reference.

XV.

7

1        Exemplary Damages: All of the above described concealment of material facts

2 and related fraudulent conduct was accomplished maliciously, oppressively and

3 fraudulently and with the design and intention of harming and defrauding Plaintiff. By

4 reason thereof, Plaintiff has become entitled to an award of substantial exemplary

5 damages to be set by the court.

6                          XVI.

7        Attorney Fees: The Real Estate Contract executed by and between Plaintiff and

8 Vitalich provides for an award of attorney fees to the prevailing party. Plaintiff has

9 reasonably and necessarily incurred attorney fees in representing her in mediation and in

10 these proceedings. Such mediation was completed, but unsuccessful. The amount of

11 said fees is presently unknown, but will be specified by amendment to this complaint or

12 proven at the time of trial.

13               **SECOND CAUSE OF ACTION:**

14          **FRAUDULENT EXPRESSIONS OF OPINION**

15    **BY FIDUCIARIES AND PERSONS WITH SUPERIOR KNOWLEDGE**

16     **AND SPECIAL INFORMATION AND FALSE PROMISES**

17                       XVII

18        Incorporation by Reference: The allegations contained in Paragraphs I-XVI are

19 hereby referred to and made a part hereof by this reference thereto.

20                       XVIII.

21        Duties of All Defendants: Defendant, Vitalich, utilized his far superior real estate

22 experience and his clear understanding of the facts and risks of the proposed investments

23 and purchases herein described, Vitalich referred Plaintiff to his co-conspirator real

24 estate brokers and agents. In accepting the representation of Plaintiff in the following

25 described transactions, Defendants, brokers, agents and their related companies and

26 fictitiously named enterprises assumed the responsibility of verifying all material false

27

28                      8

representations made by Vitalich and Lauren in the course of the promotion and sale of the Marina Drive property, which they failed to do.

XIX.

Expressions of Opinions and False Promises by Defendants Possessing Superior Knowledge and Special Information:  Prior to the sale of Marina Drive to Plaintiff, Defendants possessed far superior knowledge, sophistication and special information than that of Plaintiff, concerning the specific property, real estate generally, and the real estate market, notwithstanding their fiduciary relationship to Plaintiff and their conflicts of interest, made through John Vitalich and Mark Lauren, the following representations and expressions of opinion to Plaintiff with the intention and purpose of inducing her to purchase Marina Drive and invest almost her entire equity  in Dolphin ($200,000.00) in a highly speculative syndication owned, promoted and sold by companies wholly owned and controlled by her own broker and agent, and related corporations:

A.  Marina Drive and Dolphin would appreciate in value by $300,000.00 within two years;

B.  There would be "no problem" in obtaining financing for Plaintiff's proposed purchase of Marina Drive;

C.  Plaintiff would be able to pay for the existing $4,500.00 monthly payments on Dolphin, plus the anticipated $6,000.00 monthly payments on Marina Drive, with the benefits of a $24,000.00 payment from Vitalich out of the Marina Drive escrow, plus interest earnings if she invested $200,000.00 in the already losing and extremely dangerous investment venture variously known as "Running Horse Golf and Country Club" and "Running Horse Development", among other fictitious names, which Plaintiff is informed and believes actually were secret alter egos and fictitious names for Cypress Investment Corporation, her own already conflicted real estate broker;

9

D. The proposed investment in Running Horse was a secure investment and guaranteed to make her money;

E. Such expressions of opinion were compounded and exacerbated by false promises of Defendants: because of Plaintiff's concern in assuming obligations which would total over $10,000.00 per month for house payments alone, she proposed that her purchase of Marina Drive be contingent upon her sale of Dolphin. However, because of Defendants' then secret, but desperate need for cash and Defendants' wrongful agreement and intention to deceive and defraud Plaintiff, Defendants represented to Plaintiff both orally and in writing that Vitalich (or his assignee) would purchase Dolphin within 6 months from close of escrow of Marina Drive at the then appraised value thereof (approximately $789,000.00) if the same did not sell by that time.

## XIX.

Expression of Opinions by Defendants Equivalent to Factual Representations: The above described expressions of opinion and false promises by persons with superior knowledge and special information on the subject matters thereof were equivalent to representations of fact pursuant to BAJI 12.32 because, under the circumstances, it was reasonable for plaintiff to rely and act upon such opinions as facts. Further, Defendants falsely purported to have the ability to render correct opinions on the aforesaid subjects,

## XX.

Representations and Promises Confirmed in Writing: The above described representations and assurances were confirmed in writing by a "Letter of Intent" and "Revised Letter of Intent" drafted and presented by Defendants to Plaintiff on the same day as the preparation and delivery to Plaintiff of the "Residential Purchase Agreement and Joint Escrow Instructions", ("Purchase Agreement") on May 2, 2006. Copies of said Letter of Intent, Revised Letter of Intent and Purchase Agreement are attached

10

hereto, marked Exhibits "B", "C", and "D", respectively.   In addition, Defendants orally represented to Plaintiff that the contingency of the Dolphin sale "would not work" because the  proceeds of the Marina Drive property were immediately needed to close another escrow.

XXI.

Fraudulent Expressions of Opinion and False Promise:  All of such expressions of opinion and promises were incorrect and false, and the promise to repurchase was false, and the same were known by Defendants to be false, in that:

A. Marina Drive did not appreciate in value as represented, and no promise or prediction to that effect could be reasonably or responsibly given;

B.  There was a significant problem which precluded refinancing in that the effect of the concealment and fraudulent conduct of Defendants herein described completely ruined Plaintiff and disabled her from obtaining any financing;

C. For the same reasons, plus the loss of the entire $200,000.00 Plaintiff invested in Running Horse at the urging, and under the "guidance" and advice of Defendants, Plaintiff was disabled from making the requisite payments on both Dolphin and Marina Drive;

D. The proposed and actual "investments" in Running Horse were extremely dangerous, volatile and destined to failure;

E.  Defendant, Vitalich, failed and refused to honor his oral and written commitment to repurchase Marina Drive; that there was no intention to perform same at the time it was made; that the promise was made to induce plaintiff to rely on same in proceeding with the transaction without a contingency; and Plaintiff relied upon such promises and was justified in so doing because of the above described  fiduciary relationships, secret conflicts of interest and the superior knowledge and special

11

information of Defendants.

XXII.

Absence of Factual Basis: Defendants did not have a sufficient factual basis or knowledge to permit them to make the above described incorrect expressions of opinion and false promises, and had no intention or expectation that they would be performed.

XXIII.

Damages fraudulent incorrect expressions of opinion and false promises: Damages have been sustained by Plaintiff as alleged in Paragraph I hereof. The allegations of which are hereby incorporated by reference.

**THIRD CAUSE OF ACTION:**

**BREACH OF FIDUCIARY DUTY AND EXECUTED**

**CONFLICTS OF INTEREST**

XXIV.

Incorporation by Reference: The allegations contained in Paragraphs I-XXIII are hereby referred to and made a part hereof by this reference thereto.

XXV.

Breach of Fiduciary Duties and Active Conflicts of Interest: Cypress and O'Meara acted as the real estate brokers, and Lauren as the real estate agent for Plaintiff in all of the real estate transactions herein described. Defendants violated their fiduciary duties to Plaintiff, and engaged in active conflicts of interest in so doing. Defendants were aware of their lack of ability to make and render the above described representations, expressions of opinion and promises accurately and truthfully and were aware that they were breaching their fiduciary duties to Plaintiff, and engaging in active conflicts of interest in so doing. As to those representations of performance, Defendants had far superior knowledge of the facts and were aware that Plaintiff was relying upon the trust and confidence she reposed in Defendants as to the accuracy of such representations. Nevertheless, Defendants orally

12

made the above untrue and inaccurate representations to Plaintiff for the express purpose of inducing her to purchase Marina Drive and invest $200,000.00 in Running Horse. Said purchase and investment were represented, structured and turned out to be one integrated transaction which closed contemporaneously    Accordingly, Defendants sold their own principal already losing, extremely dangerous investments notwithstanding they knew or should have known they were highly unsuitable for Plaintiff and that it would be virtually impossible for Plaintiff to recover her payments and investment, or even to satisfy her increased obligations without losing all of her above-described, highly-leveraged properties to foreclosure.

XXVI.

Deprivation of Objective Professional Advice: In addition to the strictly prohibited conflicts of interest by real estate and securities promoters herein described, such multiple conflicts and breaches of fiduciary duties severely damaged Plaintiff by depriving her of skilled, impartial professional advice in both the real estate and securities transactions and thereby fraudulently induced her to purchase real estate which she could not afford and to make "loans", "investments" and to purchase securities which were clearly unsuitable for her and far beyond her risk thresh hold.

XXVII.

Damages: Breaches of Fiduciary Duty: Conflicts of Interest: Damages have been sustained by Plaintiff as alleged in Paragraph I hereof. The allegations of which are hereby incorporated by reference.

WHEREFORE, Plaintiff prays for Judgment against Defendants as follows:

FIRST: A Judgment of Non-Dischargeability declaring that the Judgment attached hereto is *res judicata* and that the Defendants presently owe to Plaintiff all of the obligations recited in said Judgment.

SECOND:    For reasonable attorney fees incurred and to be incurred herein

13

according to proof in accordance with the terms of the above described Deposit Receipt
Contracts drafted by Defendants;

      THIRD:     For costs of suit herein;

      FOURTH:    For general relief.

DATED: April 1, 2010

David M. Hollingsworth
Attorney for Plaintiff

14

# Exhibit A

1  DAVID M. HOLLINGSWORTH - BAR NO. 36405
   LAW OFFICES OF DAVID M. HOLLINGSWORTH
2  1474 Deer Flat Road
   Monterey, CA 93940
3  Tel. (831) 375-3135
   Fax. (831) 375-3883

4
   Attorneys for Plaintiff
5

6

7

8

9        SUPERIOR COURT OF THE STATE OF CALIFORNIA

10           FOR THE COUNTY OF MONTEREY

11

12

13  MARILYN POPE,                          Case No.: M90481

14          Plaintiff,

15                                         JUDGMENT

16      vs.

17  JOHN VITALICH, MARIA TERESA
    VITALICH, CYPRESS INVESTMENT,
18  CORPORATION., A Corporation,
    MARK LAUREN, THOMAS JOSEPH
19  O'MEARA, RUNNING HORSE
    LLC, A CORPORATION, AND
20  DOES 1-50, Inclusive,

21          Defendants,
    _____/
22

23       This cause having heretofore come on for determination in a prove-up hearing

24  before the above entitled Court on Wednesday, October 14, 2009, David M.

25  Hollingsworth and Plaintiff, Marilyn Pope, appearing in behalf of Plaintiff,

26       Plaintiff has dismissed all other Defendants, other than Defendants John and Maria

27
    POPE v. VITALICH et al. (Case No.: M90481)
28
                                    1

Case: 10-05090   Doc# 1   Filed: 04/05/10   Entered: 04/05/10 14:57:00   Page 16 of 30

FILED

OCT 27 2009

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
M. PUSLEY   DEPUTY

Vitalich, without prejudice. The default of John Vitalich and Maria Vitalich, his wife, hereinafter collectively designated "Vitalich", has been heretofore duly entered. The challenges by said Defendants to such defaults and Motion for Reconsideration of Orders denying the Motion to Set Aside the Default have been denied.

Plaintiff testified in her own behalf and offered Exhibits and Requests for Judicial Notice which were admitted and considered by the Court, The Court having duly considered the proferred evidence, both oral and documentary, and having reviewed the pleadings, AND GOOD CAUSE THEREFORE,

IT IS HEREBY ADJUDGED:

### JUDGMENT

Plaintiff, MARILYN POPE, is awarded Judgment as follows:

$500,000.00 in economic damages plus interest at 10% per year from April 18, 2008, plus attorney fees in the amount of $40,672.00, as against Defendants John Vitalich and Maria Teresa Vitalich. As of October 18, 2009, principal and interest will total $575,000.00, plus $137.98 per day until paid.

$200,000.00 in exemplary damages as against Defendant, John Vitalich because in all of the above matters, John Vitalich acted oppressively, fraudulently and in breach of his fiduciary relationship with Plaintiff, and with the intention to inflict wilful and malicious injury upon Plaintiff and her above described property.

Plaintiff waives costs of suit.

Dated: October 27, 2009.

Honorable Susan Dauphine,
Judge, Superior Court

POPE v. VITALICH et al. (Case No.: M90481)

2

Exhibit B

# Letter of Intent

I, John Vitalich (or my assignee), agree to purchase the property located at 161 Dolphin Circle, Marina, Ca., within six months of the closing date on the sale of 3275 Marina Dr., Marina, Ca to Marilyn Pope. Sales price on the property at Dolphin Circle to be at the then current appraised value. Seller (Marilyn Pope) to credit Buyer (John Vitalich, or assignee) up to $50,000 credit through escrow for Buyer's closing costs.

If the property is listed with the broker of Marilyn's choice, John Vitalich (or his assignee) is to be excluded from the listing. Should the property sell within that time frame to another party, this Letter of Intent shall be considered null and void.

Marilyn Pope (Buyer) agrees to buy 3275 Marina Drive, Marina, Ca., for $974,000 with Seller (John Vitalich) to pay Buyer's non-recurring closing costs through that escrow, closing on or about May 15, 2006. John Vitalich to give Marilyn Pope $24,000 outside the close of this escrow.

_____
John J. Vitalich    May 2, 2006

_____
Marilyn Pope    May 2, 2006

Exhibit C

# Letter of Intent (*Revised*)

I, John Vitalich (or my assignee), agree to purchase the property located at

161 Dolphin Circle, Marina, Ca., within six months of the closing date on

the sale of 3275 Marina Dr., Marina, Ca to Marilyn Pope. Sales price on the

property at Dolphin Circle to be at the then current appraised value. Seller

(Marilyn Pope) to ~~credit Buyer (John Vitalich, or assignee) up to $50,000~~

credit through escrow for Buyer's closing costs. ~~If she took Seller will pay clos~~

If the property is listed with the broker of Marilyn's choice, John Vitalich (or

his assignee) is to be excluded from the listing. Should the property sell

within that time frame to another party, this Letter of Intent shall be void.


Marilyn Pope (Buyer) agrees to buy 3275 Marina Drive, Marina, Ca., for

$974,000 from Seller (John Vitalich). John Vitalich to give Marilyn Pope

$24,000 outside the close of this escrow. If Marilyn Pope closes that escrow

on or before May 16, 2005, John Vitalich will give an additional $24,000 as

a performance incentive.  Additionally, ~~John Vitalich will not be required to~~

~~buy the property at 161 Dolphin Ct., Marina, should this performance~~

~~incentive be paid.~~ This revised Letter of Intent supersedes the one dated May

2, 2006.

John J. Vitalich     May 3, 2006          Marilyn Pope     May 3, 2006

# Exhibit D



CALIFORNIA
ASSOCIATION
OF REALTORS®

**FORM RPA-11**

RESIDENTIAL PURCHASE AGREEMENT
AND JOINT ESCROW INSTRUCTIONS
(AND RECEIPT FOR DEPOSIT)
For Use With Single Family Residential Property — Attached or Detached

Date **MAY 2, 2006** , at **CARMEL** , California.

1. OFFER:
   A. THIS IS AN OFFER FROM **MARILYN POPE** , (Buyer).
   B. THE REAL PROPERTY TO BE ACQUIRED is described as **3275 MARINA DR** , ("Buyer").
      **MARINA** , Assessor's Parcel No. _____ , County of **MONTEREY** , situated in
   C. THE PURCHASE PRICE offered is **NINE HUNDRED SEVENTY FOUR THOUSAND** , California, ("Property").
   D. CLOSE OF ESCROW shall occur _____ Days After Acceptance (or ☒ on **MAY 16, 2006** Dollars $ **974,000** (date)).

2. FINANCING: Obtaining the loans below is a contingency of this Agreement unless: (i) either 2H or 2I is checked below or (ii) otherwise agreed. Buyer shall act diligently and in good faith to obtain the designated loans. Obtaining deposit, down payment and closing costs is not a contingency.
   A. BUYER HAS GIVEN A DEPOSIT TO THE AGENT SUBMITTING THE OFFER
      (or to ☐ _____ ), made payable to **OLD REPUBLIC TITLE** by Personal
      Check, or ☐ _____ , which shall be held uncashed until Acceptance and then ........ $ **(5,000)**
      deposited within 3 business days after Acceptance or ☐ _____
      ☐ with Escrow Holder, ☐ into Broker's trust account, or ☐ _____
      Buyer represents that funds will be good when deposited with Escrow Holder.
   B. INCREASED DEPOSIT shall be deposited by Buyer with Escrow Holder within _____ Days After Acceptance,
      or ☐ _____ .............. $ _____
   C. FIRST LOAN IN THE AMOUNT OF ................................................................ $ **779,200**
      (1) NEW First Deed of Trust in favor of LENDER, encumbering the Property, securing a note payable at maximum
          interest of _____ % fixed rate, or _____ % initial adjustable rate with a maximum interest rate cap of
          _____ %, balance due in _____ years, amortized over _____
          exceed _____ . (These terms apply whether the designated loan is conventional, FHA or VA.) years. Buyer shall pay loan fees/points not to
      (2) ☐ FHA ☐ VA: (The following terms only apply to the FHA or VA loan that is checked.)
          Seller shall pay (i) _____ % discount points, (ii) other fees not allowed to be paid by Buyer,
          not to exceed $ _____ , and (iii) the cost of lender required Repairs not otherwise provided for
          in this Agreement, not to exceed $ _____
          (Actual loan amount may increase if mortgage insurance premiums, funding fees or closing costs are financed.)
   D. ADDITIONAL FINANCING TERMS: ................................................ $ **194,800**
      _____
      ☐ Seller financing, (C.A.R. Form SFA-11); ☐ Junior financing; ☐ assumed financing (C.A.R. Form PAA-11).
   E. BALANCE OF PURCHASE PRICE (not including costs of obtaining loans and other closing costs) to be deposited with
      Escrow Holder within sufficient time to close escrow. _____
   F. TOTAL PURCHASE PRICE ................................................ $ _____
   G. LOAN CONTINGENCY shall remain in effect until the designated loans are funded (or ☐ _____ Days After Acceptance, by which time Buyer shall give Seller $ **974,000**
      written notice of Buyer's election to cancel this Agreement if Buyer is unable to obtain the designated loans. If Buyer does not give Seller such notice, the contingency of obtaining the designated loans shall be removed by the method specified in paragraph 14).
   H. ☐ NO LOAN CONTINGENCY: (If checked) Obtaining any loan in paragraphs 2C, 2D or elsewhere in this Agreement is not a contingency of this Agreement. If
      Buyer does not obtain the loan, and as a result Buyer does not purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.
   I. ☐ ALL CASH OFFER: (If checked) No loan is needed to purchase the Property. Buyer shall, within 5 (or ☐ _____ ) Days After Acceptance, provide Seller written
      verification of sufficient funds to close this transaction. Seller may cancel this Agreement in writing within 5 Days After (i) time to provide verification expires, if Buyer
      fails to provide verification or (ii) receipt of verification, if Seller reasonably disapproves it.
   J. LOAN APPLICATIONS; PREQUALIFICATION: Within 5 (or ☐ _____ ) Days After Acceptance, Buyer shall provide Seller a letter from lender or mortgage loan
      broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified for the NEW loan indicated above. If Buyer fails to provide
      such letter within that time, Seller may cancel this Agreement in writing.
   K. ☐ APPRAISAL CONTINGENCY: (If checked) This Agreement is contingent upon Property appraising at no less than the specified total purchase price. If there
      is a loan contingency, the appraisal contingency shall remain in effect until the loan contingency is removed. If there is no loan contingency, the
      appraisal contingency shall be removed within 10 (or ☐ _____ ) Days After Acceptance.

The copyright laws of the United States (Title 17 U.S. Code) forbid
the unauthorized reproduction of this form, or any portion thereof,
by photocopy machine or any other means, including facsimile or
computerized formats. Copyright © 1991-2000, CALIFORNIA
ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

Buyer and Seller acknowledge receipt of a copy of this page.
Buyer's Initials ( _____ )( _____ )
Seller's Initials ( _____ )( _____ )

EQUAL HOUSING
OPPORTUNITY

Property Address: __32751 RINA DR., MARINA, CA__     Date: __5-02-06__

**3.   CLOSING AND OCCUPANCY**

A.   Buyer ☒ does, ☐ does not intend to occupy Property as Buyer's primary residence.

B.   Seller occupied or vacant property: Occupancy shall be delivered to Buyer at __8__ AM/PM, ☒ on the date of Close Of Escrow, ☐ on _____, or ☐ no later than _____ Days After Close Of Escrow. (See C.A.R. Form PAA-11, paragraph 2.) If transfer of title and occupancy do not occur at the same time, Buyer and Seller are advised to (i) enter into a written occupancy agreement, and (ii) consult with their insurance advisors.

C.   Tenant occupied property: At Close Of Escrow, Property shall be vacant unless otherwise agreed in writing. Seller has the responsibility to (i) comply with rent control and other Law necessary to deliver Property vacant, and (ii) determine whether timely vacancy is permitted under such Law.

D.   At Close Of Escrow, Seller assigns to Buyer any assignable warranty rights for items included in the sale and shall provide any available copies of such warranties.  Brokers cannot and will not determine the assignability of any warranties.

E.   At Close Of Escrow, unless otherwise agreed in writing, Seller shall provide keys and/or means to operate all locks, mailboxes, security systems, alarms and garage door openers. If Property is a unit in a condominium or other common interest subdivision, Buyer may be required to pay a deposit to the Homeowners' Association ("HOA") to obtain keys to accessible HOA facilities.

**4.   ALLOCATION OF COSTS (If checked):** If any of the inspections or reports in 4A, B, C and D are checked, then with regard to that item, Buyer shall have approval (including approval of alternate methods of treatment, if any, recommended by the Pest Control Report), removal and cancellation rights, and obligations as specified in paragraph 14.  (The rights in paragraph 14 apply whether or not Buyer and Seller agree below who is to pay for Section 1 or Section 2 recommended work.)

A.   **PEST CONTROL**

☐ Buyer ☐ Seller shall pay for a Pest Control Report (for wood destroying pests and organisms only) ("Report"). The Report shall be prepared by _____, a registered structural pest control company, who shall separate the Report into sections for evident infestation or infection (Section 1) and for conditions likely to lead to infestation or infection (Section 2). The Report shall cover the main building and attached structures and, if checked: ☐ detached garages and carports, ☐ detached decks, ☐ the following other structures on the Property: _____. The Report shall not cover roof coverings. If Property is a unit in a condominium or other common interest subdivision, the Report shall cover only the separate interest and any exclusive-use areas being transferred, and shall not cover common areas. Water tests of shower pans on upper level units may not be performed unless the owners of property below the shower consent. If Buyer requests inspection of inaccessible areas, Buyer shall pay for the cost of entry, inspection and closing for those areas, unless otherwise agreed. A written Pest Control Certification shall be issued prior to Close Of Escrow, unless otherwise agreed, and only if no infestation or infection is found or if required corrective work is completed.

(Section 1) ☐ Buyer ☐ Seller shall pay for work recommended to correct "Section 1" conditions described in the Report and the cost of inspection, entry and closing of those inaccessible areas where active infestation or infection is discovered.

(Section 2) ☐ Buyer ☐ Seller shall pay for work recommended to correct "Section 2" conditions described in the Report if requested by Buyer.

**OTHER INSPECTIONS AND REPORTS**

B.   ☐ Buyer ☐ Seller shall pay to have septic or private sewage disposal system inspected. _____

C.   ☐ Buyer ☐ Seller shall pay to have domestic wells tested for water potability and productivity. _____

D.   ☐ Buyer ☐ Seller shall pay for a natural hazard zone disclosure report prepared by _____

**GOVERNMENT REQUIREMENTS AND RETROFIT**

E.   ☐ Buyer ☒ Seller shall pay for smoke detector installation and/or water heater bracing, if required by Law.  Prior to Close Of Escrow, Seller shall provide Buyer a written statement of compliance in accordance with state and local Law, unless exempt.

F.   ☐ Buyer ☒ Seller shall pay the cost of compliance with any other minimum mandatory government retrofit standards, inspections and reports if required as a condition of closing escrow under any Law.

**ESCROW, TITLE AND OTHER COSTS**

G.   ☒ Buyer ☒ Seller shall pay escrow fee __SPLIT 50/50__
Escrow Holder shall be __OLD REPUBLIC TITLE (MARYANN STORZELLI)__

H.   ☐ Buyer ☐ Seller shall pay for owner's title insurance policy specified in paragraph 12.
Owner's title policy to be issued by _____
(Buyer shall pay for any title insurance policy insuring Buyer's Lender, unless otherwise agreed.)

I.   ☐ Buyer ☒ Seller shall pay County transfer tax or transfer fee. _____

J.   ☐ Buyer ☐ Seller shall pay City transfer tax or transfer fee. _____

K.   ☐ Buyer ☐ Seller shall pay HOA transfer fees. _____

L.   ☐ Buyer ☐ Seller shall pay HOA document preparation fees. _____

M.   ☐ Buyer ☐ Seller shall pay the cost, not to exceed $ _____, of a one-year home warranty plan, issued by _____
with the following optional coverage: _____

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2000, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

Buyer and Seller acknowledge receipt of a copy of this page.
Buyer's Initials (____) (____)
Seller's Initials (____) (____)



Property Address: 3275 MARINA DR, MARINA, CA

Date: 5-02-06

**5. TRANSFER DISCLOSURE STATEMENT; NATURAL HAZARD DISCLOSURE STATEMENT; LEAD-BASED PAINT HAZARD DISCLOSURES; AND OTHER DISCLOSURES WITH CANCELLATION RIGHTS:**

A. Within the time specified in paragraph 14, if required by Law, a Real Estate Transfer Disclosure Statement ("TDS"), Natural Hazard Disclosure Statement ("NHD"), Federal Lead-Based Paint Disclosures and pamphlet ("Lead Disclosures"), disclosure regarding industrial use (Property is in or affected by a zone or district allowing manufacturing, commercial or airport use) and military ordnance disclosure shall be completed and delivered to Buyer, who shall return Signed Copies to Seller.

B. In the event Seller, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information, or representations previously provided to Buyer (including those made in a TDS) of which Buyer is otherwise unaware, Seller shall promptly provide a subsequent or amended disclosure, in writing, covering those items. However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies disclosed in reports received by Buyer.

C. Seller shall (i) make a good faith effort to obtain a disclosure notice from any local agencies that levy a special tax on the Property pursuant to the Mello-Roos Community Facilities Act, and (ii) promptly deliver to Buyer any such notice made available by those agencies.

D. If the TDS, the NHD, the Lead Disclosures, industrial use disclosure, military ordnance disclosure, the Mello-Roos disclosure notice, or a subsequent or amended disclosure is delivered to Buyer after the offer is Signed, Buyer shall have the right to cancel this Agreement within 3 Days After delivery in person, or 5 Days After delivery by deposit in the mail, by giving written notice of cancellation to Seller or Seller's agent. (Lead Disclosures sent by mail must be sent certified mail or better.)

**6. DISCLOSURES:** Within the time specified in paragraph 14, Seller shall: (I) disclose if Property is located in any zone identified in 6A and provide any other information required for those zones; (ii) if required by Law, provide Buyer with the disclosures and other information identified in 6B; and, (iii) if applicable, take the actions specified in 6C and 6D. Buyer, within the time specified in paragraph 14, shall then investigate the disclosures and other information provided to Buyer, and the database in 6E, and take the action specified in paragraph 14.

A. **NATURAL HAZARD ZONE:** Special Flood Hazard Areas; Potential Flooding (Inundation) Areas; Very High Fire Hazard Zones; State Fire Responsibility Areas; Earthquake Fault Zones; Seismic Hazard Zones; or any other zone for which disclosure is required by Law.

B. **PROPERTY DISCLOSURES AND PUBLICATIONS:** Earthquake Guides (and questionnaire) and Environmental Hazards Booklet.

C. ☐ (If checked) **CONDOMINIUM/COMMON INTEREST SUBDIVISION:** Property is a unit in a condominium, or other common interest subdivision. Seller shall request from the HOA and, upon receipt, provide to Buyer: (i) Copies of any documents required by Law; (ii) disclosure of any pending or anticipated claims or litigation by or against the HOA; (iii) a statement containing the location and number of designated parking and storage spaces; (iv) Copies of the most recent 12 months of HOA minutes for regular and special meetings, if available; and (v) the names and contact information of all HOAs governing the Property (C.A.R. Form HOA-11).

D. **NOTICE OF VIOLATION:** If, prior to Close Of Escrow, Seller receives notice or is made aware of any notice filed or issued against the Property for violations of any Law, Seller shall immediately notify Buyer in writing.

E. **DATA BASE DISCLOSURE: NOTICE:** The California Department of Justice, sheriff's departments, police departments serving jurisdictions of 200,000 or more and many other local law enforcement authorities maintain for public access a data base of the locations of persons required to register pursuant to paragraph (1) of subdivision (a) of Section 290.4 of the Penal Code. The data base is updated on a quarterly basis and a source of information about the presence of these individuals in any neighborhood. The Department of Justice also maintains a Sex Offender Identification Line through which inquiries about individuals may be made. This is a "900" telephone service. Callers must have specific information about individuals they are checking. Information regarding neighborhoods is not available through the "900" telephone service.

**7. CONDITION OF PROPERTY:**

A. Unless otherwise agreed, (i) Property is sold (a) in its PRESENT physical condition on the date of Acceptance and (b) subject to Buyer inspection rights; (ii) Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance, and (iii) all debris and personal property not included in the sale shall be removed by Close Of Escrow.

B. SELLER SHALL DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS AND MAKE OTHER DISCLOSURES REQUIRED BY LAW.

C. Buyer has the right to inspect the Property and, based upon information discovered in those inspections, may reasonably request that Seller make Repairs, corrections or take other action as specified in paragraph 14.

D. Note to Buyer: You are strongly advised to conduct inspections of the entire Property in order to determine its present condition since Seller may not be aware of all defects affecting the Property or other factors that you consider important. Property improvements may not be built according to codes or in compliance with current Law, or have had permits issued.

E. Note to Seller: Buyer may request that you make certain Repairs and, in the event you refuse or are unable to make those Repairs, Buyer may cancel this Agreement as specified in paragraph 14.

**8. A. ITEMS INCLUDED IN SALE:** All EXISTING fixtures and fittings that are attached to the Property are INCLUDED IN THE PURCHASE PRICE (unless excluded in paragraph 8C below), and shall be transferred free of liens and without Seller warranty. Items to be transferred shall include, but are not limited to, existing electrical, mechanical, lighting, plumbing and heating fixtures, fireplace inserts, solar systems, built-in appliances, window and door screens, awnings, shutters, window coverings, attached floor coverings, television antennas, satellite dishes and related equipment, private integrated telephone systems, air coolers/conditioners, pool/spa equipment, garage door openers/remote controls, attached fireplace equipment, mailbox, in-ground landscaping, including trees/shrubs, and (if owned by Seller) water softeners, water purifiers and security systems/alarms.

B. **ADDITIONAL ITEMS INCLUDED:** The following items of personal property, free of liens and without Seller warranty, are INCLUDED IN THE PURCHASE PRICE _____

C. **ITEMS EXCLUDED FROM SALE:** _____

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2000, CALIFORNIA

Buyer and Seller acknowledge receipt of a copy of this page.

Buyer's Initials ( M R )( )
Seller's Initials ( )( )



Property Address: 3275 MARINA DR, MARINA, C  Date: 5-02-06

**9. BUYER'S INVESTIGATION O   PROPERTY CONDITION: Buyer's Acceptance**  e condition of and any other matter affecting the Property is a contingency  c this Agreement, as specified in this paragraph and paragraph 14. Buyer shall have the right to conduct inspections, investigations, tests, surveys, and other studies ("Inspections"), including the right to: (i) inspect for lead-based paint and other lead-based paint hazards; (ii) inspect for wood destroying pests and organisms ("Pest Control Report"); and (iii) review the registered sex offender database.  No Inspections shall be made by any governmental building or zoning inspector, or government employee, without Seller's prior written consent, unless required by Law. Buyer shall complete these Inspections and give any written notice to Seller within the time specified in paragraph 14.  At Seller's request, Buyer shall give Seller, at no cost, complete Copies of all Inspection reports supporting Buyer's written requests.  Seller shall make Property available for all Inspections.  Seller shall have water, gas and electricity on for Buyer's Inspections and through the date possession is made available to Buyer.

**10. REPAIRS:** Repairs shall be completed prior to final verification of condition unless otherwise agreed in writing. Repairs to be performed at Seller's expense may be performed by Seller or through others, provided that work complies with applicable Law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible.  Seller shall: (i) obtain receipts for Repairs performed by others; (ii) prepare a written statement indicating the Repairs performed by Seller and the date of such Repairs; and (iii) provide Copies of receipts and statements to Buyer prior to final verification of condition.

**11. BUYER INDEMNITY AND SELLER PROTECTION FOR ENTRY UPON PROPERTY:** Buyer shall: (i) keep Property free and clear of liens; (ii) indemnify and hold Seller harmless from all liability, claims, demands, damages and costs; and (iii) Repair all damages arising from Inspections. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry policies of liability, workers' compensation, and other applicable insurance, defending and protecting Seller from liability for any injuries to persons or property occurring during any inspections or work done on the Property at Buyer's direction prior to Close Of Escrow. Seller is advised that certain protections may be afforded Seller by recording a Notice of Non-responsibility for Inspections and work done on the Property at Buyer's direction.

**12. TITLE AND VESTING:**
A. Within the time specified in paragraph 14, Buyer shall be provided a current preliminary (title) report, which is only an offer by the title insurer to issue a policy of title insurance, and may not contain every item affecting title. Buyer shall provide written notice to Seller in accordance with and within the time specified in paragraph 14.

B. At Close Of Escrow, Buyer shall receive a grant deed conveying title (or, for stock cooperative or long-term lease, an assignment of stock certificate or of Seller's leasehold interest), including oil, mineral and water rights if currently owned by Seller. Title shall be subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other matters that are of record or disclosed to Buyer prior to Close Of Escrow, unless otherwise requested in writing by Buyer and agreed to by Seller within the time specified in paragraph 14. However, title shall not be subject to any liens against the Property, except for those specified in this Agreement. Title shall vest as designated in Buyer's supplemental escrow instructions. **THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES.**

C. Buyer shall receive a CLTA/ALTA Homeowner's Policy of Title Insurance, if available for the Property. If not, Buyer shall receive a standard coverage owner's policy (CLTA or ALTA-R with regional exceptions). A title company, at Buyer's request, can provide information about availability, desirability, coverage, and cost of various title insurance coverages and indorsements. If Buyer desires title coverage other than that required by this paragraph, Buyer shall instruct Escrow Holder in writing and pay any increase in costs.

**13. SALE OF BUYER'S PROPERTY:**
A. This Agreement is NOT contingent upon the sale of any property owned by Buyer unless paragraph 13B is checked.
OR B. ☐ (If checked) This Agreement IS CONTINGENT on the Close Of Escrow of Buyer's property, described as (address) _____ ("Buyer's Property").
(1) Buyer's Property is:
(a) ☐ (if checked) not yet listed for sale.
OR (b) ☐ (if checked) listed for sale with _____
OR (c) ☐ (if checked) in escrow No. _____ with _____ company. holder, scheduled to close escrow on _____ escrow within 5 Days After Seller's request, a Copy of the contract for the sale of Buyer's Property, escrow instructions, and all amendments and modifications thereto. If Buyer fails to provide the documents within that time, Seller may cancel this Agreement in writing. If Buyer's Property does not close escrow by the date specified in this paragraph for close of escrow of Buyer's Property, then either Seller or Buyer may cancel this Agreement in writing.
(2) After Acceptance:
(a) (Applies UNLESS B (2)(b) is checked) Seller SHALL have the right to continue to offer the Property for sale. If Seller accepts another written offer, Seller shall give Buyer written notice to: (i) remove this contingency in writing; (ii) remove the loan contingency, if any, in writing; and (iii) comply with the following additional requirement(s): _____
If Buyer fails to complete these actions within 72 (or ☐_____ ) hours After receipt of such notice, Seller may cancel this Agreement in writing.
OR (b) ☐ (if checked) Seller shall have the right to continue to offer the Property for sale for back-up offers only and shall not invoke the notice provisions in paragraph 13 B(2)(a) during the term of this Agreement.

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2000, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

Buyer and Seller acknowledge receipt of a copy of this page.
Buyer's Initials ( _____ )( _____ )
Seller's Initials ( _____ )( MHN )

EQUAL HOUSING OPPORTUNITY

REVISION DATE 10/2000   Print Date R OCT 00
RPA-11 (PAGE 2 OF 8)

Reviewed by _____ Date _____

Property Address: _3275 MARINA DR., MARINA, CA_     Date: _5-02-06_

**14. TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS:** The following time periods may only be extended, altered, modified or changed by mutual written agreement.

**A. ORDERING, COMPLETING AND REVIEWING INSPECTIONS AND REPORTS:**
  (1) **SELLER HAS: 5 (or ☐ _____ ) Days After Acceptance** to order, request or complete all reports, disclosures and information for which Seller is responsible under paragraphs 4, 5, 6A, B and C, and 12. Seller has **2 Days After** receipt (or completion) of any of these items to provide it to Buyer. **Buyer has 5 (or ☐ _____ ) Days After receipt** of (i) each of the above items and (ii) notice of code and legal violation under paragraph 6D to review the report, disclosure or other information.
  (2) **BUYER HAS: 14 (or ☐ _____ ) Days After Acceptance** to complete all Inspections, investigations and review of reports and other applicable information, including the sex offender database (paragraph 6E).
  (3) **BUYER HAS: 10 (or ☐ _____ ) Days. After Buyer's receipt** of Lead Disclosures pursuant to paragraph 5A, to complete Inspections for and review reports on lead-based paint and lead-based paint hazards.

**B. (1) APPROVAL OR REQUEST:** Within the times specified above (or 2G for loan contingency), Buyer shall provide Seller with either (i) an unconditional approval and removal of the applicable contingency, or (ii) a reasonable written request that Seller Repair or take other action (or for loan contingency, cancellation if Buyer is unable to obtain the designated loan).
  (2) **EFFECT OF BUYER'S REQUEST:** If, pursuant to B(1), Buyer reasonably requests that Seller Repair or take other action, Buyer and Seller have **5 (or ☐ _____ ) Days After Seller's** receipt of Buyer's request to reach mutual written agreement on Buyer's request. If (i) Seller has agreed in writing to unconditionally and completely take the action requested by Buyer, or (ii) Buyer and Seller have reached a mutual written agreement with respect to those items, then the transaction shall proceed on those terms. Seller has no obligation, express or implied, to satisfy Buyer's requests.
  (3) **EFFECT OF NO WRITTEN AGREEMENT ON BUYER'S REQUESTS:** If, at the expiration of the time in B(2), neither B(2)(i) nor (ii) has occurred, Buyer has **2 (or ☐ _____ ) Days** to cancel this Agreement in writing.

**C. ACTIVE OR PASSIVE REMOVAL OF CONTINGENCIES AND CANCELLATION RIGHTS:**
  (1) ☐ **ACTIVE METHOD** (Applies only if checked):
    (a) (No written request or removal by Buyer) If, within the time specified in A, Buyer does not give Seller written notice pursuant to B(1), Seller may cancel this Agreement in writing. Notwithstanding the expiration of the time specified, Buyer retains the right to give Seller written notice under B1 at any time prior to receiving Seller's written cancellation. Once Seller receives Buyer's written request or removal, Seller may not cancel this Agreement pursuant to paragraph C(1)(a).
    (b) (No written cancellation by Buyer) If, within the time specified, Buyer does not give Seller written notice of cancellation pursuant to B(3), either Buyer or Seller may cancel this Agreement in writing at any time prior to Buyer and Seller reaching mutual written agreement with respect to any requests made pursuant to B(1).
  (2) **PASSIVE METHOD:** If, within the time specified, Buyer does not give Seller (i) a reasonable written request pursuant to B(1) (or for loan contingency, cancellation if Buyer is unable to obtain the designated loan) or (ii) written notice of cancellation pursuant to B(3) if no agreement is reached on Buyer's requests, then Buyer shall be deemed, as applicable, to have unconditionally approved and removed the contingency or withdrawn the request and waived any right to cancel associated with the requested item.

**D. EFFECT OF REMOVAL:** If Buyer removes any contingency or cancellation right by the active or passive method, as applicable, Buyer shall conclusively be deemed to have: (i) completed all Inspections, investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; (ii) elected to proceed with the transaction; and, (iii) assumed all liability, responsibility, and expense for repairs or corrections pertaining to that contingency or cancellation right, or for inability to obtain financing if the contingency pertains to financing, unless, pursuant to B(2) or elsewhere in this Agreement, Seller agrees to make Repairs or take other action.

**E. EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written NOTICE OF CANCELLATION pursuant to rights duly exercised under the terms of this Agreement, Buyer and Seller agree to Sign mutual instructions to cancel the sale and escrow and release deposits, less fees and costs, to the party entitled to the funds. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. Release of funds will require mutual, Signed release instructions from Buyer and Seller, judicial decision or arbitration award. A party may be subject to a civil penalty of up to $1,000 for refusal to sign such instructions if no good faith dispute exists as to who is entitled to the deposited funds (Civil Code §1057.3).

**15. FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final inspection of the Property within **5 (or _____ ) Days** prior to Close Of Escrow, NOT AS A CONTINGENCY OF THE SALE, but solely to confirm (i) Property is maintained pursuant to paragraph 7A, (ii) Repairs have been completed as agreed, and (iii) Seller has complied with Seller's other obligations.

**16. LIQUIDATED DAMAGES:** If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. If the Property is a dwelling with no more than four units, one of which Buyer intends to occupy, then the amount retained shall be no more than 3% of the purchase price. Any excess shall be returned to Buyer. Release of funds will require mutual, Signed instructions from both Buyer and Seller, judicial decision or arbitration award. **BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION FOR ANY INCREASED DEPOSIT. (C.A.R. FORM RID-11)**

Buyer's Initials _M_ / _____     Seller's Initials _X_ / _MMV_

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2000, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

Buyer and Seller acknowledge receipt of a copy of this page.
Buyer's Initials ( _MG_ )( _____ )
Seller's Initials ( _____ )( _MMV_ )

EQUAL HOUSING OPPORTUNITY

Property Address: 3275 IV NA DR, MARINA, CA

Date: 5-02-06

**17. DISPUTE RESOLUTION:**

A. **MEDIATION:** Buyer and Seller agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action. Paragraphs 17B(2) and (3) below apply whether or not the Arbitration provision is initialed. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.

B. **ARBITRATION OF DISPUTES:** (1) Buyer and Seller agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration, including and subject to paragraphs 17B(2) and (3) below. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of residential real estate Law experience, unless the parties mutually agree to a different arbitrator, who shall render an award in accordance with substantive California Law. In all other respects, the arbitration shall be conducted in accordance with Part III, Title 9 of the California Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered in any court having jurisdiction. The parties shall have the right to discovery in accordance with Code of Civil Procedure §1283.05.

(2) **EXCLUSIONS FROM MEDIATION AND ARBITRATION:** The following matters are excluded from mediation and arbitration: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; (iv) any matter that is within the jurisdiction of a probate, small claims, or bankruptcy court; and (v) an action for bodily injury or wrongful death, or any right of action to which Code of Civil Procedure §337.1 or §337.15 applies. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a violation of the mediation and arbitration provisions.

(3) **BROKERS:** Buyer and Seller agree to mediate and arbitrate disputes or claims involving either or both Brokers, provided either or both Brokers shall have agreed to such mediation or arbitration prior to, or within a reasonable time after, the dispute or claim is presented to Brokers. Any election by either or both Brokers to participate in mediation or arbitration shall not result in Brokers being deemed parties to the Agreement.

"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."

"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."

Buyer's Initials [signature]   Seller's Initials [signature]

**18. PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless otherwise agreed in writing, the following items shall be PAID CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, rents, HOA regular, special, and emergency dues and assessments imposed prior to Close Of Escrow, premiums on insurance assumed by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment District bonds and assessments that are now a lien. The following items shall be assumed by Buyer WITHOUT CREDIT toward the purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and HOA special assessments that are now a lien but not yet due. Property will be reassessed upon change of ownership. Any supplemental tax bills shall be paid as follows: (i) for periods after Close Of Escrow, by Buyer; and, (ii) for periods prior to Close Of Escrow, by Seller. TAX BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall be made based on a 30-day month.

**19. WITHHOLDING TAXES:** Seller and Buyer agree to execute any instrument, affidavit, statement or instruction reasonably necessary to comply with federal (FIRPTA) and California withholding Law, if required (C.A.R. Forms AS-11 and AB-11).

**20. MULTIPLE LISTING SERVICE ("MLS"):** Brokers are authorized to report the terms of this transaction to any MLS, to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS.

**21. EQUAL HOUSING OPPORTUNITY:** The Property is sold in compliance with federal, state and local anti-discrimination Law.

**22. ATTORNEY FEES:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing Buyer or Seller, except as provided in paragraph 17A.

**23. SELECTION OF SERVICE PROVIDERS:** If Brokers give Buyer or Seller referrals to persons, vendors, or service or product providers ("Providers"), Brokers do not guarantee the performance of any of those Providers. Buyer and Seller may select ANY Providers of their own choosing.

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2000, CALIFORNIA

Buyer and Seller acknowledge receipt of a copy of this page.

Buyer's Initials ( [signature] )( )
Seller's Initials ( [signature] )( )

Property Address: 3275 N. INA DR., MARINA, CA.

**24. TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated
in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to
its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision
of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this
Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer
and Seller.

Date: 5-02-06

**25. OTHER TERMS AND CONDITIONS,** including ATTACHED SUPPLEMENTS:
A. ☑ Buyer's Inspection Advisory (C.A.R. Form BIA-11)
B. SELLER TO PAY BUYERS KLOSING COSTS THROUGH ESCROW, NOT TO
C. EXCEED 3% of SALES PRICE.
SALE IS TO BE "AS -IS"

**26. DEFINITIONS:** As used in this Agreement:
A. "**Acceptance**" means the time the offer or final counter offer is accepted in writing by the other party and communicated in accordance
with this Agreement or the terms of the final counter offer.
B. "**Agreement**" means the terms and conditions of this Residential Purchase Agreement and any counter offer and addenda.
C. "**Days**" means calendar days, unless otherwise required by Law.
D. "**Days After**" means the specified number of calendar days after the occurrence of the event specified, not counting the calendar date
on which the specified event occurs, and ending at 11:59PM on the final day.
E. "**Close Of Escrow**" means the date the grant deed, or other evidence of transfer of title, is recorded. If scheduled close of escrow
falls on a Saturday, Sunday or legal holiday, then the close of escrow date shall be the next business day after the scheduled close of
escrow date.
F. "**Copy**" means copy by any means including photocopy, NCR, facsimile and electronic.
G. "**Law**" means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal
legislative, judicial or executive body or agency.
H. "**Repairs**" means any repairs (including pest control), alterations, replacements, modifications and retrofitting of the Property provided
for under this Agreement.
I. "**Signed**" means either a handwritten or electronic signature.
J. **Singular and Plural** terms each include the other, when appropriate.
K. **C.A.R. Form** means the specific form referenced, or another comparable form agreed to by the parties.
L. "**Electronic Copy**" or "**Electronic Signature**" means, as applicable, an electronic copy or signature complying with California Law.
Buyer and Seller agree that electronic means will not be used by either one to modify or alter the content or integrity of the Agreement
without the knowledge and consent of the other.

**27. AGENCY:**
A. **POTENTIALLY COMPETING BUYERS AND SELLERS:** Buyer understands that Broker representing Buyer may also represent other
potential buyers, who may consider, make offers on or ultimately acquire this Property. Seller understands that Buyer may consider,
make offers on or purchase other properties similar to the Property. Buyer and Seller acknowledge and consent to Broker(s)'
representation of such potential buyers and sellers before, during and after Broker(s)' representation of Buyer and Seller.
B. **CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction:
Listing Agent CYPRESS INVESTMENT CORPORATION (Print Firm Name) is the agent of (check one):
☐ the Seller exclusively; or ☒ both the Buyer and Seller.
Selling Agent CYPRESS INVESTMENT CORPORATION (Print Firm Name) (if not same as Listing Agent)
of (check one): ☐ the Buyer exclusively; or ☐ the Seller exclusively; or ☒ both the Buyer and Seller.
Real Estate Brokers are not parties to the Agreement between Buyer and Seller.

**28. JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**
A. The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of Buyer and
Seller to Escrow Holder, which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual
instructions to close the transaction: 1, 2, 4, 12, 13B, 14E, 18, 19, 24, 25B and C, 26, 28, 30, 32A and 33. The terms and conditions of
the Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which
Escrow Holder need not be concerned. Buyer and Seller will receive Escrow Holder's general provisions directly from Escrow Holder
and will execute such provisions upon Escrow Holder's request. To the extent the general provisions are inconsistent or conflict with this
Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller will execute
additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to complete this transaction.
B. A Copy of this Agreement shall be delivered to Escrow Holder within 3 business days After Acceptance
(or ☐ _____). Escrow will be deemed open when Escrow Holder has
Signed an acknowledgement of receipt of a Copy of this accepted Agreement. Buyer and Seller authorize Escrow Holder to accept
and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The
validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs the Agreement.
C. Brokers are a party to the Escrow for the sole purpose of compensation pursuant to paragraphs 30 and 32A. Seller hereby irrevocably
assigns to Brokers compensation specified in paragraphs 30 and 32A from Seller's proceeds, and irrevocably instructs Escrow Holder to
disburse those funds to Brokers at Close Of Escrow. Compensation instructions can be amended or revoked only with the written consent
of Brokers.

**29. Buyer and Seller acknowledge and agree that:** (a) Brokers do not decide what price Buyer should pay or Seller should accept; (b) Brokers
do not guarantee the performance or Repairs of others who have provided services or products to Buyer or Seller; and (c) they will seek
legal, tax, insurance, title and other desired assistance from appropriate professionals.

The copyright laws of the United States (Title 17 U.S. Code) forbid
the unauthorized reproduction of this form, or any portion thereof,
by photocopy machine or any other means, including facsimile or
computerized formats. Copyright © 1991-2000, CALIFORNIA
ASSOCIATION OF REALTORS

Buyer and Seller acknowledge receipt of a copy of this page.

Buyer's Initials (____) (____)
Seller's Initials (____) (____)

Property Address: 3275 MAR... DRIVE, MARINA, CA _____ Date: 5-02-06

30. BROKER COMPENSATION FROM BUYER: Upon Close Of Escrow, Buyer agrees to pay compensation for services as follows: N/A

_____ N/A _____ to _____ N/A _____

31. TERMS AND CONDITIONS OF OFFER: This is an offer to purchase the Property on the above terms and conditions. All paragraphs with spaces _____, Broker. for initials by Buyer and Seller are incorporated in this Agreement only if initialed by all parties. If at least one but not all parties initial, a counter offer is required until agreement is reached. Unless Acceptance of offer is Signed by Seller, and a Copy of the Signed offer is personally received by Buyer, or by MARK E. LAUREN _____, who is authorized to receive it, by (date) 5-02-06, at 6 AM/PM the offer shall be deemed revoked and the deposit shall be returned. Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to communication of Acceptance as above. Buyer has read and acknowledges receipt of a Copy of the offer and agrees to the above confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing.

BUYER _Marilyn Pope_ Date 5/2/06 BUYER _____ Date _____
(Print name) MARILYN POPE                    (Print name)
(Address) _____

32. BROKER COMPENSATION FROM SELLER:
   A. Upon Close of Escrow, Seller agrees to pay compensation for services as follows:
   _____, to _____, Broker, and
   _____, to _____, Broker, and
   (if checked) ☐ an administrative/transaction fee of $_____ to _____, Broker
   (or, if not completed, as per listing agreement).
   B. (1) If escrow does not close, compensation in 32A is payable: (i) upon Seller's default if completion of sale is prevented by default of Seller; or (ii) when and if Seller collects damages from Buyer, by suit or otherwise, if completion of sale is prevented by default of Buyer and then in an amount equal to one-half of the damages recovered, but not to exceed the above compensation, after first deducting title and escrow expenses and the expenses of collection, if any. (2) In any action, proceeding or arbitration relating to the payment of compensation in 32A or B, the prevailing party shall be entitled to reasonable attorney fees and costs, except as provided in paragraph 17A.

33. ACCEPTANCE OF OFFER: Seller warrants that Seller is the owner of this Property, or has the authority to execute this Agreement. Seller accepts the above offer, agrees to sell the Property on the above terms and conditions, and agrees to the above confirmation of agency relationships. Seller has read and acknowledges receipt of a Copy of this Agreement, and authorizes Broker to deliver a Signed Copy to Buyer.
   ☐ (If checked) SUBJECT TO ATTACHED COUNTER OFFER, DATED _____

SELLER _____ Date 5/2/06 SELLER _Maria Teresa Vitalich_ Date 2 May 06
(Print name) JOAN J VITALICH             (Print name) MARIA TERESA VITALICH
(Address) 5000 BEACH WOOD DR SEASIDE CA 93555

Agency relationships are confirmed as above. Real Estate Brokers are not parties to the Agreement between Buyer and Seller.

Agent who submitted offer for Buyer acknowledges receipt of deposit, if any, if specified in paragraph 9A.

Real Estate Broker (Selling Firm Name) CYPRESS INVESTMENT By _Mark Lauren_ Date 5-02-06
Address 26619 CARMEL CENTER PL, #200, CARMEL, CA 93921 Phone/Fax/E-mail (831) 624-0600
Real Estate Broker (Listing Firm Name) _____ By _____ Date _____
Address _____ Phone/Fax/E-mail _____
(ML) (Initials) ACKNOWLEDGMENT OF RECEIPT: Buyer or authorized agent acknowledges receipt of Signed Acceptance on (date) 5-02-2006 at 3:17 AM/PM.

_____
Escrow Holder Acknowledgment:
Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked ☐ a deposit in the amount of $_____),
counter offer numbers _____ and _____
_____, and agrees to act as Escrow Holder subject to paragraph 28 of this Agreement, any
supplemental escrow instructions and the terms of Escrow Holder's general provisions.

The date of communication of Acceptance of the Agreement as between Buyer and Seller is _____

Escrow Holder _____
By _____ Escrow # _____
Address _____ Date _____
                        Phone/Fax/E-mail _____
Escrow Holder is licensed by the California Department of ☐ Corporations, ☐ Insurance, ☐ Real Estate. License # _____
_____

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.
Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.

Reviewed by _____